**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN A.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 C 1099** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") finding that he is liable for an overpayment of Social Security Disability Insurance Benefits in the amount of $57,714.00 for the period of April 1, 2008 through August 1, 2011. (Administrative Record (R.) 109-11). Plaintiff seeks review of that determination under 42 U.S.C. §405(g), hoping to have it overturned, and the Commissioner asks that the determination be affirmed.

**BACKGROUND**

Disability overpayment cases are often distasteful affairs. The overpayment is almost always the "fault" of the Social Security Administration ("SSA") – at least in the common sense of the word. But that is irrelevant, because the question is whether the recipient is without any fault. 42 U.S.C. 404(b). This particular case is more distasteful than most because the recipient from whom the SSA is seeking repayment of a significant sum became disabled in service of his Country. During plaintiff's second tour

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

of duty in Iraq, the Humvee he was driving hit an IED.   Plaintiff lost both of his legs above the  knee in the explosion, and what remained of his left arm had to be amputated below the elbow.  He  underwent  over  40  different  surgical  procedures  at  Walter Reed Hospital, and  on  November  16,  2006,  he  filed  an  application  for  Title  II disability  insurance  benefits  (R.48).  He  was  found  disabled  as  of  October  23, 2005, and  his  entitlement  to  benefits  began  April  2006.  *Id*.

Plaintiff didn't give up and pushed himself to himself to have a productive life however possible.  He was able to become a spokesperson for a wheelchair company. On  November  16,  2011,  SSA  notified  Anderson  that  because  of  the  work  he  had done since January  2007,  it  was  finding  that  his disability ended as of January 2008, and that he was entitled to receive benefit payments only for an additional two months, through  March  2008  (R.15).  He was also told that there was an extended three-year period during which he would receive benefits in any months where his earnings did not meet  the  minimum  for  substantial  gainful  activity.  (R. 15).  That period  began  in October 2007 and ended October 2010. (R. 15).

The SSA contacted plaintiff in June 2009, indicating that it needed him to provide information about his work activity.  (R. 218).  On October 1, 2009, plaintiff's mother wrote  to  report  he  was  working  as  a  speaker  for  various  organizations  and  making income  from  various  sources.  (R. 216).  SSA sent  requests  to  those  multiple organizations and received reports over the next couple of months.  (R. 219-34).

SSA wrote again in July 2010, asking for more information about plaintiff's work and listed the information it had at that point.  (R. 245-47).  Plaintiff was to fill out a work activity report for work beginning in 2008, but instead wrote, "I've done this every

year [and] it seems you have all the information already how many of these do I have to fill out.  You have all the info.  No change."  (R. 236-41).  His mother resent her earlier letter and wrote, "[p]lease note, this is a permanent situation – this will not  change – please review [and] make your decision accordingly." (R. 248).  But the issue for SSA seemed be that the situation *did* change, all the time, as plaintiff's situation as a speaker meant he was working for an ever changing roster of employers.

SSA asked for more information again in February 2011.  (R. 249).  Plaintiff did not fill out the form, SSA contacted him by phone and he explained his situation and his expenses, which would not bring his earnings below SGA level.  (R. 261).  The next letter plaintiff got was dated December 21, 2011.  In it, SSA told him that it had overpaid him in the amount of $39,588, and that benefit payments had been suspended  as  of September  1,  2011  (R.17).  The letter explained that SSA found plaintiff had been working from January 2008 through September 2010, but had been entitled to payments from January 2008 through March 2008, and from October 2010 through September 2011.  (R. 17).  The letter then told plaintiff he should refund the $39,588 in just 30 days. It  did  also  allow  that  he  could  make  a  partial  payment,  explain  his  financial circumstances, and offer a payment plan.  (R. 17).  In order to explain financial circumstances, plaintiff was instructed to provide *original* records by mail. (R. 18). SSA assured him those original records would be returned.  (R. 18).

Plaintiff filed a request on January 10, 2012, asking SSA to waive repayment of the overpayment.  He noted that he'd told SSA that he was working and they told him it was okay, he was still entitled to benefits. (R. 23).  He listed income and expenses on the SSA form.  At that time he was making over $9,000 a month– about $3000 from work

and $6000 from his military pension – and had just $5300 in monthly expenses. (R. 26). He claimed to have just $500 on hand in a checking account. (R. 25).

On January 25, 2012, SSA notified plaintiff that the overpayment amount was no longer $39,588, but had somehow increased – the letter did not explain – to $57,714 (R.30). On February 17, 2012, SSA denied Plaintiff's request for waiver, stating that he "knew or should have known" he was being overpaid (R.33-35). Plaintiff appealed that determination and on March 9, 2012, SSA notified him that waiver was still not being granted (R.37). The denial of his appeal was dated March 21, 2012 (R.43), and on May 17, 2012, plaintiff filed a timely request for hearing (R.46).

On February 11, 2013, a hearing was held before Administrative Law Judge (ALJ) Cynthia Bretthauer (R.78-89). At that hearing, the ALJ attempted to explain the $18,000 overpayment discrepancy. She said it was not as clear as it should be, but after the initial overpayment of $39,588, plaintiff became eligible for benefits again when his earnings decreased and, again, SSA made another error resulting in another overpayment. (R.82). Plaintiff testified that he "pretty much knew" after the second year of his spokesman work he wasn't entitled to benefits and wrote and called the SSA and payments were stopped. (R. 85). Actually, according to SSA's Detailed Earnings Query record, plaintiff earned $8,589 in 2007 and $25,772 in 2008 – hence, the raise. (R. 55-56, 127, 261). The ensuing three years, his income ranged from $24,031 to $28,818. (R.56-57, 65). But, then, he continued to receive benefits and he just assumed there was some regulation he was unaware of. (R. 86). He was confused, as he even received benefits *after* he got the overpayment notice. (R. 87). Then he sent another letter and had a conference. (R. 87). Because the SSA kept paying him, he assumed he was

4

entitled to it.  (R. 87).  He thought it was part of the three-year extended period SSA notified him about. (R. 87).

Plaintiff requested review of the ALJ's decision and, on August 28, 2014, the Appeals Council denied the request for review making ALJ Bretthauer's decision the final determination of the Commissioner (R.2-5). Plaintiff sought review in the United States District Court for the Northern District of Illinois pursuant to 42 U.S.C. §405(g) on October 24, 2014.  On March 24, 2016, Magistrate Judge Schenkier remanded the case. Following the remand another hearing was held before the same ALJ on September 7, 2017.

The second hearing necessarily covered a ten-year period in which plaintiff had to recall events dating back to his convalescence.  (R. 125).  There was confusion about the three-year period.  The ALJ attempted to explain that, but stopped short: "I mean you don't get to be paid for 36 months, you have what's called a 36 month of extended eligibility.  Let's jump back . . . ."  (R. 124).   The ALJ than took another swing:

> The 36 means, if you fell below a certain level of income, you could get back on disability without having to reapply. . . . it doesn't mean you could earn money and still collect disability benefits."  (R.125).

But that explanation was wrong as well, because an individual could earn up to a certain amount *and* collect benefits.  And, the SSA had decided to pay those extended benefits to plaintiff.  (R. 17).

Plaintiff said he reported his income, and as he said, "I tried telling you guys three times and you guys kept paying me."  (R. 127).  He made phone calls.  But, as we know, as early as 2009, plaintiff did not fill out the required forms and said nothing was changing.  He again conceded that he knew he was no longer entitled to benefits when he

5

got a raise with the wheelchair company his second year, about 2009. (R. 129). He "knew it was wrong to be collecting that, and Social Security." (R. 130). He started making phone calls to SSA about it. (R. 130). Plaintiff also conceded that he didn't report his income initially; only after SSA contacted him about it. He had been under the impression that filing his taxes served as reporting his income. (R. 129). But, thereafter, he understood that the IRS and SSA didn't share information like that. (R. 129).

Plaintiff asked the ALJ what else he was supposed to have done, and the ALJ answered, "what else you're supposed to do is just not keep the money. You're supposed to return it" even if he thought he was entitled to it. (R. 127). The ALJ tried one more time to explain the confusing system to the plaintiff:

> if somebody took money out of your bank account an put it in someone else's, would you expect that person to give it back, even though they thought they were entitled to it because it was put in their bank account?

(R. 133-34). Obviously, that's an overly simplistic analogy for a very complicated system.

On March 1, 2013, ALJ Bretthauer rendered her decision denying Anderson's waiver request (R.7-12). A timely request for review of the ALJ's decision was filed with SSA's Appeals Council (R.6), and on August 28, 2014, the Appeals Council denied the request for review making ALJ Bretthauer's decision the final determination of the Commissioner (R.2-5).

**ALJ's DECISION**

The ALJ noted that the plaintiff did not allege or appear to have any cognitive impairment or intelligence deficit. (R. 111). The ALJ found that the plaintiff signed statements in October 2009 and in August 2010 that show he was aware that he could

only earn up to a certain level of income and still receive benefits. (R. 111). This was based on evidence that, for unexplained reasons, the SSA had neglected to include in the file for plaintiff's previous hearing. (R. 111). And, somewhat oddly, the ALJ also said there was no indication in the record that the plaintiff had ever told the SSA he thought he could earn income for 36 months as he was claiming "now," suggesting this was some newly fabricated excuse. (R. 111). But, the plaintiff claimed as much at least as early as December 26, 2013. (R. 68).

The ALJ went on to explain that the plaintiff's initial notice of award had information that would tell a recipient "what must be reported and how to report it", "what to do if you go to work", "if you go to work, special rules allow us to continue your cash payments", and that there were still more publications available at SSA offices. (R. 111). The ALJ reiterated that when the SSA initially contacted the plaintiff regarding overpayments in 2009, he signed statements in 2009 and 2010 that indicated he understood that he could only work for 9 months during a trial work period. (R. 112). So the ALJ found there was no evidence to reasonably maintain plaintiff was confused about being able to work at a substantial gainful activity level for the 36-month extended period of eligibility. (R. 111, 112). As such, the ALJ didn't believe the plaintiff when he claimed to be confused regarding the 36-month period. She pointed to the notice of award he received way back in 2006 which she said clearly explained that he would get 2 months of payments after his disability ended. (R. 112).

The ALJ noted that the plaintiff twice testified that he knew he was not entitled to collect benefits given his income as of December 2008 at the latest. The evidence demonstrate that he had been earning SGA in 2007, within a month or two of receiving

his award letter. (R. 112-13). The ALJ also noted that plaintiff testified that from his experience in the Army he knew that in overpayment situations, the recipient had to pay it back. (R. 113). The ALJ found that, "[g]iven all of the evidence, including the SSA's documents [plaintiff] was able to read and understand, the prior knowledge of Army repayments, his signed statements and admissions, and the lack of any corroboration for his testimony . . . [plaintiff] 'could have been expected to know' that he was not entitled to benefits from the inception of his work in 2007. (R. 115). The ALJ directed the payment center to determine an affordable repayment plan.

## ANALYSIS

There is no dispute here that plaintiff received an overpayment. When the SSA mistakenly has made an overpayment of disability benefits, the SSA may not recover an overpayment from the recipient when: (1) the recipient is without fault and (2) "recovery would defeat the purpose of [the SSA] or would be against equity and good conscience." 42 U.S.C. 404(b). According to the regulations governing the implementation of this statutory provision, "[a]lthough the [Agency] may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault." 20 C.F.R. § 404.507. A finding of fault can be based on any of the following:

> (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or

(b) Failure to furnish information which he knew or should have known to be material; or

(c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

20 C.F.R. §404.507. The ALJ's determination that plaintiff was not without fault in causing the overpayment in this case is based on subsection (c).

While the Social Security Act allows the agency to waive recovery when a beneficiary is without fault, 42 U.S.C. § 404(b)(1); *Jackson v. Saul*, 808 F. App'x 383, 385 (7th Cir. 2020); *Casey v. Berryhill*, 853 F.3d 322, 329 (7th Cir. 2017), it must seek recovery if the beneficiary is not entitled to a waiver. §404(a)(1); *Berg v. Soc. Sec. Admin.*, 900 F.3d 864, 868 (7th Cir. 2018); *Wilkening v. Barnhart*, 139 F. App'x 715, 718 (7th Cir. 2005). It doesn't matter if SSA may have also been at fault in making the overpayment; the beneficiary has the burden to prove he was without any fault in order to secure a waiver. *Jackson v. Saul*, 808 F. App'x 383, 385 (7th Cir. 2020). "The bar to prevail on such a claim is rather high." *Casey*, 853 F.3d at 329. So is the bar to overturn an ALJ's decision. If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780,

782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017). The substantial evidence standard is a low hurdle to negotiate. *Biestek* , 139 S. Ct. at 1154.

Plaintiff argues that the ALJ's determination that he was "not without fault' in accepting an overpayment is not supported by substantial evidence. According to plaintiff, the ALJ erred in finding he was not without fault because it penalizes him for trying to do the right thing and fails to address his reasonably held subjective belief that he was entitled to keep the benefits based on the assurance of SSA agents, and the belief that he fell under some special regulation. [Dkt. #21, at 8-9].

Understandably, honest people don't want to be found as being at some degree of fault. But "not without fault" in this context could mean the beneficiary simply made an honest mistake. *Hill, ex rel. Hill v. Comm'r of Soc. §.*, 417 F. App'x 103, 104 (2d Cir. 2011); *Desoye v. Saul*, 2021 WL 1172675, at *6 (S.D.N.Y. 2021). Bad faith is not necessary. *Center v. Schweicker*, 704 F.2d 678, 679–80 (2nd Cir.1983); *Thomas v. Sullivan*, 923 F.2d 849 (4th Cir. 1991). And, contrary to the tenor of plaintiff's brief, "the repayment is not punitive in nature. A mistake occurred, of which [plaintiff] was the beneficiary. Now he has to make the public fisc whole." *Watson v. Sullivan*, 940 F.2d 168, 172 (6th Cir. 1991). There is nothing inappropriate or surprising or unfair about this result. Mistakes are inherent in the human condition. Everyone makes them. *Illinois v. Allen,* 397 U.S. 337, 346-347 (1970). *Accord Mayle v. Illinois*, 956 F.3d 966, 969 (7th Cir. 2020); *In re City of Milwaukee*, 788 F.3d 717, 722 (7th Cir. 2015); *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332 (1997). But the law frowns on playing "gotcha" and relying on a blunder to gain an opportunistic advantage. This basic principle applies in all contexts – no less to questions of governmental overpayments

10

than to human errors in others contexts. *Cf. Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.,* 58 F.3d 1227, 1231 (7th Cir.1995); *Market Street Associates; Packer Trading Co. v. CFTC,* 972 F.2d 144, 150 (7th Cir 1992); *Centex Construction v. James,* 374 F.2d 921, 923 (8th Cir.1967).

Here, the ALJ's determination is supported by substantial evidence. There were the notices plaintiff received and the notices he signed. *See, e.g., Wilkening*, 139 F. App'x at 719–20 (first overpayment notice informed plaintiff that working would render her ineligible for benefits). Most importantly, the plaintiff testified, twice, that he did know he should not be receiving benefits while working. As such, his situation is similar to that of the beneficiary in *Mehalshick v. Comm'r Soc. §.*, 609 F. App'x 710, 713 (3d Cir. 2015), who was found to be not without fault when "she continued to accept disability payments because she assumed the Administration 'knew what [it was] doing.'" 609 F. App'x at 713. *See, also, Watson*, 940 F.2d at 172 (claimant could not reasonably claim to be misled by continued receipt of benefits).

Is the system confusing? Yes. But many of those intricacies, like additional payments of benefits for three months after disability ceases, 20 C.F.R. § 404.1592a(a)(2)(I); a nine-month trial work period, 42 U.S.C. § 422(c)(4); 20 C.F.R. § 404.1592(a); and a thirty-six-month extended eligibility period, 42 U.S.C. § 423(a)(1); 20 C.F.R § 404.1592a(a), work in the favor of the beneficiary. Without them, the program would be easier to administer, and far fewer overpayments would result. But that is not the goal of the system. Which is a valid reason for setting the bar to obtain a waiver of overpayment so high.[2]

---

[2] Because we find the ALJ's decision that plaintiff was not without fault is supported by substantial
(continued...)

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #24] is granted.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/14/21

---

[2](...continued)
evidence, we do not reach plaintiff's argument that requiring repayment is against equity and good conscience. *See Berg v. Soc. Sec. Admin.*, 900 F.3d 864, 868 (7th Cir. 2018); *Wilkening v. Barnhart*, 139 F. App'x 715, 720 (7th Cir. 2005); 42 U.S.C. § 404(b)(1). See also 20 C.F.R. §§ 404.507–509.